CENTRAL NATIONAL BANK OF CLEVELAND, APPELLEE; *v.*
GALLAGHER ET AL.; GALLAGHER, EXR., APPELLANT.

(No. 28562—Decided February 21, 1968.)

*Mr. John H. McCombs,* for appellee.
*Mr. Steven W. Kormendy, Mr. Milton Dunn* and *Mr. Harry A. Hanna,* for appellant.

CORRIGAN, C. J. We have before us an appeal on questions of law from a judgment of the Court of Common Pleas of Cuyahoga County against two defendants in the amount of Nine Thousand, Nine Hundred and Seventy-five Dollars with interest.

The cause was tried on an agreed statement of facts which reflect that the defendant John Gallagher and the decedent, Michael J. Gallagher, his father, on March 1, 1962, opened a joint and survivorship savings account in the amount of $10,000 at the Kenmore branch of appellee bank. Upon the terms of the deposit agreement, either party was authorized to withdraw any or all of the amount upon presentation of the passbook.

On April 3, 1962, Michael J. Gallagher went to the bank and asked to withdraw the entire balance of $10,000. Since he was unable to present the passbook, he signed the following indemnity agreement:

"Representation as to loss of Passbook

"It is hereby represented that a certain savings Passbook No. 24565 issued by the Central National Bank of Cleveland and owned by the undersigned has been lost, mislaid, stolen or destroyed; that the account evidenced by the above passbook has not been assigned or pledged to any person whatsoever;

"That there is now due the undersigned on said account the sum of ten thousand dollars ($10,000.00). In consideration of the crediting or paying of said amount or the issuance of a new passbook without surrender of said original passbook the undersigned hereby agrees to indemnify the said bank and save it harmless against any claim arising out of the presentation of said original passbook.

"Dated this 3rd day of April 1962.

"[Signed] Michael J. Gallagher"

The bank then released the $10,000 to Michael J. Gallagher who immediately put the amount into a new account held solely in his name. Michael J. Gallagher died on April 24, 1962, and, on April 25, 1962, the defendant-appellant, John Gallagher, presented the allegedly lost passbook on the original joint account No. 17-24565 at the bank. At John

Gallagher's request, the teller erroneously paid to him $9,975 in checks and cash. When the error was discovered at the end of the business day, the bank officials contacted John Gallagher and asked him to return the money. He refused. Later the bank sued John Gallagher and the executor of Michael J. Gallagher's estate for the amount paid by mistake to John Gallagher. Following a finding and judgment of the trial court in favor of plaintiff bank, the defendant-appellant executor appealed to this court.

Defendant-appellant assigns four claims of error as follows:

1. In enforcing a purported indemnity agreement which was void *ab initio* as violative of public policy.

2. In failing to apply required common-law standards of strict construction to said indemnity agreement.

3. In failing to abrogate said indemnity agreement for want of consideration.

4. In failing to abrogate said indemnity agreement as contrary to the express provisions of Section 1304.03 (A), Revised Code.

The question posed by the first and third assertions of error is whether a bank can enter into an agreement with a depositor who has lost his passbook, whereby the bank is indemnified against its own negligence.

On this issue appellant argues that such an agreement designed to protect a bank from its own negligence is against public policy and lacks consideration. Contra, appellee cites Ohio cases which hold that contractual exemptions of negligence are valid. See *St. Paul Mercury Indemnity Co.* v. *Kopp* (1954), 70 Ohio Law Abs. 259; *Kay* v. *Pennsylvania Rd. Co.* (1952), 156 Ohio St. 503; *George H. Dingledy Lumber Co.* v. *Erie Rd. Co.* (1921), 102 Ohio St. 236; *Direct Transportation Co.* v. *Baltimore & Ohio Rd. Co.* (1953), 96 Ohio App. 204; *New Amsterdam Casualty Co.* v. *Kilroy Structural Steel Co.* (1959), 81 Ohio Law Abs. 527.

The applicable rule which is quoted in full in *Kopp, supra,* follows the Restatement of the Law of Contracts, Volume II, Section 575. The last part of this rule, which is to the effect that a party who is charged with a duty of

**118**

public service is forbidden to make a contract exempting his own negligence, is chiefly the basis of appellant's argument. Appellant does not urge that contracts exempting negligence are illegal in Ohio, but does maintain that banks fall within the exceptions to that rule, i. e., that they are public service institutions.

This exception is fully stated in 39 Ohio Jurisprudence 2d 490, Negligence, Section 8:

"In regard to contracts which purport to exempt a party from liability for negligence, the first, and evidently the basic, principle is that contractual exemption from liability for negligence is rarely allowed to stand where the contracting parties are not on roughly equal bargaining terms. The farther apart the contracting parties are in their relative strength the greater is the probability that the exculpatory clause will be held invalid. Conversely, the closer they come in approaching absolute equality in bargaining strength the greater is the probability that the clause will be held valid. * * *

"* * * Aside from the cases in which the employer seeks freedom from liability for his negligence toward an employee, which have generally been held invalid as contrary to public policy and are also made void by statute, and the cases in which a common carrier attempts to exculpate itself from liability for negligent damage or injury to passengers or goods, the typical situations involving such an inequality of bargaining strength are those where public utilities or companies serving semipublic functions require their customers as a prerequisite to doing business with them to sign stipulations exempting the companies from liability for negligence. In the case of contracts between public service corporations and their customers the difference in relative bargaining power is so pronounced as to make any attempt on the part of the corporations to exempt themselves from liability for their own negligence particularly obnoxious. * * *"

Appellant cites four cases in support of the argument that banks are "charged with a duty of public service" in the sense used in II Restatement of the Law of Contracts,

Section 575. Those cases do contain language to the effect that financial institutions are engaged in a business that concerns the public welfare and are, therefore, regulated and chartered by the state. Two of the cited cases—*State Bank of Drummond* v. *Nuesse* (1961), 13 Wis. 2d 74, 108 N. W. 2d 283; and *Wyandotte Savings Bank* v. *State Banking Commr.* (1956), 347 Mich. 33, 78 N. W. 2d 612—involved actions to force the state to permit the establishment of branch banks. One of the Ohio cases, *Allen* v. *Shaker Heights Savings Assn.* (1941), 68 Ohio App. 445, concerned the rights of stockholders against their bank. The other Ohio case, *State, ex rel. Squire,* v. *National City Bank* (1936), 56 Ohio App. 401, involved the power of the Superintendent of Banks over a trust during a bankruptcy proceeding.

It is significant that none of appellant's cited cases on this issue deal with the relationship between a bank and a customer who deposits money in a savings account. Indeed, in *State, ex rel. Squire,* v. *National City Bank*, 56 Ohio App. 401, after the court had reaffirmed that the banking business was affected with the public interest in the sense that a bank needed permission from the state in order to operate, the court stated:

"However, when the policy has been determined and a bank is permitted to operate, vested rights arise in favor of those dealing with it. Contract rights are created in favor of depositors and others, and proprietary rights in property in the possession and control of the bank arise. The owners of these rights and titles are entitled to have recourse to the courts for their enforcement and protection. So long as the state permits the bank to operate as a bank, any claimant may maintain an adversary proceeding against it to the same extent that he could against any other defendant. * * *"

From the above quotation it seems that the court regarded a bank as an ordinary citizen once the state had chartered it. In addition, there is other authority to the effect that banks are not public service institutions. For example, the annotation in 175 A. L. R. 78 (1948) concluded as follows:

"Banks and their customers are generally held to deal on an equal footing and hence a contract by which the bank exempts itself from liability for its negligence is, as a rule, considered valid."

Another writer advanced the following rationale:

"While, at first glance, this preponderating authority or rule may appear to be in conflict with the rule applicable as regards certain contracts, such, for example, as a contract of transportation intending to exempt a common carrier from negligence or misconduct of the carrier or its agents, that such a stipulation is invalid as against public policy, it may be pointed out that in the case of the common carrier the customer often cannot procure the fulfilment of the need represented by the contract except by dealing with the particular carrier in question, while the bank depositor is not thus generally restricted, but may exercise a choice of banks with which to do business." 1 A. L. R. 2d 1156 (1948).

The question as to whether banks are to be regarded as ordinary citizens or as public service institutions, similar to public utilities, probably can be answered only by referring to the particular capacity in which banks are utilized. For example, it has been held in Ohio that a bank can limit its liability to holders of safe deposit boxes. 7 Ohio Jurisprudence 2d 252, Banks, Section 118. It has also been held that a bank can relieve itself of negligence with regard to night depository facilities. *Kalt* v. *Cleveland Trust Co.* (1951), 156 Ohio St. 26; 7 Ohio Jurisprudence 2d 238, Banks, Section 105. It is also clear, however, that an Ohio bank cannot avoid liability for its own negligence by requiring an indemnity agreement in a stop-payment order. *Speroff* v. *First-Central Trust Co.* (1948), 149 Ohio St. 415; Section 1304.03, Revised Code (Uniform Commercial Code 4-103).

Appellant urges strongly that the law pertinent to the stop-payment situation should control the case at bar. On the other hand, there is authority to the effect that the negotiable instrument law pertinent to stop-payment cases and the Uniform Commercial Code do not control the passbook cases.

The difference between indemnity agreements in stop-payment cases and in passbook cases lies in the historical origins of each. The common law in the former situation demanded that banks refrain at their peril from making disbursements after receiving a stop-payment order. 10 American Jurisprudence 2d 622, Section 650. In an effort to escape their common-law liability, banks required indemnity agreements from depositors who wanted to stop payment on a check. It is little wonder then that the courts struck these agreements down as being totally lacking in consideration and therefore violative of public policy. In the passbook situation, however, banks have a clear duty not to pay money out of a savings account without requiring production of the savings passbook. Section 1105.30, Revised Code; 81 A. L. R. 1150; 60 A. L. R. 2d 714; 10 American Jurisprudence 2d 508, Section 532. In addition, in the case at bar, the passbook issued to decedent contained a bylaw to the effect that the passbook would have to be presented with every request for withdrawal. To be sure, the Ohio Legislature, no doubt foreseeing the possibility of a lost passbook, does allow a bank to waive the above strict rule, in paragraph (B) of Section 1105.30, Revised Code:

"No payment or check against any savings bank account shall be made or paid unless accompanied by and entered in the passbook or other evidence of deposit or withdrawal issued for such account, except for good cause and on assurance satisfactory to the officers of the bank, * * *."

Even though the Legislature thus permits a bank to waive presentation of a passbook in certain situations, the case law is clear that a bank must be extraordinarily careful in using this exception. For example, there is authority to the effect that a bank is liable to a joint depositor if it permits waiver of the presentation rule by the other joint depositor without consulting the first party. 62 A. L. R. 2d 1109.

Therefore, in view of the above, there seems to be ample justification for a bank to require either an indemnity bond or a save-harmless agreement whenever a deposi-

tor without a passbook requests his money. Although appellant urges in assignment of error number three that indemnity agreements in both stop-payment orders and lost-passbook cases are entirely self-serving and unsupported by consideration, it is clear that these agreements are distinguishable. A bank which agrees to accommodate a depositor who cannot produce his passbook is entitled to some consideration in return for the risk taken in paying out the deposited sum. In the stop-payment situation, however, the bank's risk is imposed by law, and this risk cannot be passed on to the public via an indemnity agreement.

The premise underlying assignment of error number two—that contracts in exemption of negligence must be strictly construed—finds ample support in Ohio law. 39 Ohio Jurisprudence 2d 492, Section 8. It has been held that these contracts will not be given effect unless the exemption is expressed clearly and unequivocally. *George H. Dingledy Lumber Co.* v. *Erie Rd. Co.*, 102 Ohio St. 236; *St. Paul Mercury Indemnity Co.* v. *Kopp,* 70 Ohio Law Abs. 259. Appellant argues that, since the word "negligence" appears nowhere in the save-harmless agreement, the rules of strict construction require that the bank not be protected from its own negligence. It is true that the agreement might have been clearer had it referred expressly to the bank's negligence, but such an absence is not a fatal flaw in Ohio. *St. Paul Mercury Indemnity Co.* v. *Kopp*, 70 Ohio Law Abs. 259; *New Amsterdam Casualty Co.* v. *Kilroy Structural Steel Co.*, 81 Ohio Law Abs. 527; *George H. Dingledy Lumber Co.* v. *Erie Rd. Co.*, 102 Ohio St. 236; *General Accident Fire & Life Assurance Corp.* v. *Smith & Oby Co.* (C. C. A. 6, 1959), 272 F. 2d 581. In the above cases, the word "negligence" was not included in the indemnity agreements, yet in all except *Dingledy* the courts interpreted the agreements to cover such liability. The contract involved in the *Dingledy case* was particularly adaptable to strict interpretation by the court. The indemnification portion of that contract read as follows:

"Said lessee * * * hereby assumes all risk of loss, damage or injury, by fire or otherwise, to person or pro-

perty on or about said premises, and all risk of loss by fire to property of said Lessee, or * * * on any neighboring premises owned or occupied by said Lessee to which fire shall be communicated from the leased premises * * * or the operation, maintenance or existence of the railroad operated by said Lessor * * * and agrees to indemnify and save harmless said Lessor * * * from all claims for any and all such loss, damage or injury, whether caused by the negligence of said Lessors * * * or their servants * * *.''

When an employee of the lumber company was injured as a result of the negligent operation of the railroad's locomotive, the Erie Railroad relied on the above agreement to protect itself from liability. The court, however, held for the lumber company, stating that the obvious purpose of the indemnity agreement, as demonstrated by the use of the word ''fire'' no less than three times, was to protect the railroad from loss by fire and kindred causes. The court interpreted the language of the agreement strictly, but also literally and logically. It apparently assumed that the agreement, within the limits imposed by the court, was valid despite the absence of the word ''negligence.''

The *General Accident* decision, *supra,* involved an indemnity agreement wherein the defendant agreed to save plaintiff harmless ''from all loss * * * arising from any cause or for any reason whatsoever in or about the premises where the work is being performed.'' The United States Court of Appeals for the Sixth Circuit, relying heavily on the *Kopp* and *Kilroy* decisions, reversed the District Court and held that the above language was sufficient to indemnify plaintiff's negligence.

Other authority also supports the above cases. As stated in 10 American Jurisprudence 2d 507, Section 531:

''It is usually provided, either by statute or by the bylaws of the bank, that a savings bank shall not be required to pay any deposits without the production of the passbook or the tendering of an indemnity bond to save the bank harmless in case the payment made is improper or irregular or a mistake is made. * * *''

Negligence of the bank is strongly implied in the above

statement when "improper or irregular" payments or payments by "mistake," are referred to.

Appellant forwards two interpretations of the indemnity agreement employed by Central National Bank. He argues that the intent of this agreement was either (a) to protect the bank against the consequences of an unavoidable accident or (b) to protect the bank from a claim against the account. As an "unavoidable accident," appellant suggested that the only occurrence which would suffice would be a double payment during the time it takes a bank to record cancellation of an account. It is questionable, however, whether this interpretation of the indemnity agreement follows good public policy. Under this reasoning, an efficient bank would be penalized since its immunity would terminate as soon as its books were posted while, conversely, an inefficient bank would benefit.

Appellant's second suggested interpretation rests upon a very literal reading of the phrase "any claim arising out of presentation of said original passbook." Appellant suggests that this language implies a "causal relationship" in that the liability of the bank must arise out of presentation of the bank book but not as a result of a negligent and erroneous payment by the bank subsequent to this presentation. The obvious answer is that a causal relationship surely existed between John Gallagher's presentation of the original bank book and the subsequent loss to the bank. Also, the words "any claim," as used in the save-harmless agreement, are comprehensive enough to cover the bank's negligence.

For these reasons, assignments of error numbers 1, 2 and 3 are overruled. We find further that there is no merit to assignment of error number 4, and the same is likewise overruled.

The judgment of the Common Pleas Court is, accordingly, affirmed.

*Judgment affirmed.*

WASSERMAN and WHITE, JJ., concur.